AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

AUG 2 8 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. ED19-0464M |
| OMAR MENDEZ-GARCIA, | |
| Defendant. | |

LODGED

2019 AUG 28  AM 11: 08
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 26, 2019, in the County of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1326(a) and (b)(2) | Deported Alien Found in the United States |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Kimberly R. Christoff, U.S. Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8/28/19

_____
*Judge's signature*

City and state:  Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (951-276-6246)

## AFFIDAVIT

I, Kimberly R. Christoff, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Omar MENDEZ-Garcia, also known as ("aka") "Omar Garcia Mendez," aka "Albert Mendez," aka "Oscar Cortez," aka "Alberto Mendez," aka "Alberto Mendez Garcia" ("MENDEZ"), with a violation of Title 8, United States Code, Sections 1326(a) and (b)(2) (Deported Alien Found in the United States).

2.   Furthermore, this affidavit is made in support of an application for a warrant to search the following digital device seized from MENDEZ on August 26, 2019 and currently in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A to the search warrant application:

a.   An Apple iPhone S, Model No. A1634, IMEI No. 353350071652640 (the "SUBJECT DEVICE").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), (a)(1)(B)(i) (Conspiracy to Transport and Harbor Aliens in the United States), 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transporting Illegal Aliens for Private Financial Gain), and 1326(a), (b)(2) (Deported Alien Found in the United States) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a United States Border Patrol Agent ("BPA"), and I have been so employed since January 10, 2008.

6.    I am a graduate of the United States Border Patrol Academy and Federal Law Enforcement Training Center.  As part of my training, I received criminal investigation training that included course studies in, among other things, criminal law, immigration law, constitutional law, search and seizures, and courtroom procedure.

7.    I am currently assigned to the Indio Border Patrol Station ("IDO") as the Central District Prosecution Liaison.  I am responsible for investigating, arresting, and facilitating the prosecution of alien smuggling organizations that use the Southern and Central Districts of California as an operational corridor.  I also investigate and arrest for narcotic and bulk-cash smuggling.

8.     During the course of my employment as a BPA, I have participated in alien-smuggling investigations that have resulted in federal criminal charges.   In connection with that work, I have made arrests, prepared reports in federal proceedings, and provided sworn statements in federal criminal proceedings.   My work also has included speaking with suspects, cooperating witnesses, and other law enforcement personnel regarding the different methods by which the crime of alien smuggling is committed.

9.     Through my experience, I have gained a working knowledge and insight into the typical workings of criminal alien-smuggling organizations.   I also have gained extensive knowledge regarding the normal operational habits of persons who make their living as alien smugglers, including the behavior, speech, routes, and methods of operation of alien smugglers to avoid detection and apprehensions by law enforcement officers.

### III. <u>PROBABLE CAUSE</u>

**A.     Identification of the "Target Vehicle."**

10.     BPAs Joel Rosa, Jason Masney, and Joseph Bevis are assigned to the El Centro Sector Intelligence Unit, Alien Smuggling Identification and Deterrence Unit, out of the IDO Intelligence Office.   They operate in a plain-clothes capacity and drive in unmarked government service vehicles in order to blend in with the general public and monitor suspected illegal activity at close proximity without detection.   Those agents informed me of the following.

11.   On August 26, 2019, at approximately 9:45 a.m., BPA Rosa and BPA Masney began to watch traffic on I-10 in the Coachella Valley of California after receiving a call from BPA Bevis regarding a white Ford Explorer bearing Arizona license plate CJE8387 (the "Target Vehicle") traveling westbound on I-10.   BPA Bevis advised BPA Rosa and BPA Masney that the Target Vehicle may be associated with a known alien smuggler out of San Luis, Arizona.   Alien-smuggling organizations regularly use I-10 to transport illegal aliens to their intended destinations, particularly within the Counties of San Bernardino, Riverside and Los Angeles.   In addition, since March of 2019, El Centro and Yuma Border Patrol Sectors have increased interdictions of alien-smuggling events off of I-10.   This is likely due to the fact that the I-8 westbound checkpoint, operated by the Campo Border Patrol Station, and the Highway 86, Scenic Route 2, and the Highway 111 Checkpoints, operated by IDO, have remained operational, thus forcing illicit traffic to discover and utilize routes with less law enforcement presence.   In addition, these immigration checkpoints are strategically situated to interdict undocumented aliens and narcotics being smuggled and trafficked most frequently from the border areas of Western Arizona and Southern California.   Smugglers use I-10 in order to avoid inspection at these checkpoints in an effort to avoid detection and arrest by law enforcement authorities.

12.   Around 9:55 a.m., BPA Masney was driving westbound on I-10 when he identified the Target Vehicle also driving westbound on I-10 near the Washington Street exit in Palm

Desert, California.   BPA Masney notified BPA Rosa that he had located the Target Vehicle.   At this time, the Target Vehicle already passed BPA Rosa who was parked off of I-10 at the Jackson Street exit in Indio, California.   BPA Rosa was able to catch up to the Target Vehicle near the Cook Street exit in Palm Desert and followed the Target Vehicle for approximately six additional miles.

13.   While following, BPA Rosa saw two occupants in the Target Vehicle.   The Target Vehicle began switching lanes of traffic from the far left lane to the right lane without signaling.   The driver of the Target Vehicle also constantly checked his rear view mirror which would also make him swerve by driving over the white lane lines several times.   BPA Rosa knows from his training and experience as a BPA that smugglers traveling with illicit cargo continually check their rear view mirrors when they become nervous in an attempt to identify any following vehicles as possible law enforcement attempting to conduct surveillance.   At this time, BPA Rosa decided to contact El Centro Sector Communications Center radio dispatch to confirm vehicle registration information for Arizona license plate CJE8387, but he was unsuccessful due to poor service radio reception.

14.   BPA Rosa decided to initiate a vehicle stop in his unmarked service vehicle with his lights and siren.   The Target Vehicle yielded on the westbound shoulder of I-10 approximately a half mile west of Palm Drive in Desert Hot Springs, California.

15.   BPA Rosa positioned his service vehicle behind the Target Vehicle and approached the passenger side.  BPA Rosa identified himself as a BPA and ordered the driver to turn off *the driver* the vehicle.  The driver complied.  BPA Rosa asked LOPEZ as to his citizenship to which he replied, "U.S."  BPA Rosa then questioned the front passenger, who was later identified as MENDEZ, as to his citizenship.  MENDEZ claimed to be a Lawfully Admitted Permanent Resident ("LAPR") of the United States and a citizen of Mexico.  BPA Rosa asked MENDEZ to provide him with his LAPR or I-551 card.  MENDEZ claimed to have left his LAPR/I-551 card at home, but he provided a California state ID card. BPA Rosa handed the ID card to BPA Masney for further law enforcement checks.  At that time, BPA Masney noticed the SUBJECT DEVICE sitting on MENDEZ's lap.

16.   BPA Rosa asked the driver where he was traveling, and the driver stated that he was on his way to San Bernardino, California.  The driver claimed to know MENDEZ because he was a friend of the family and that his father has known him for a long time.  The driver began questioning the extended detention of the vehicle stop.  BPA Rosa informed the driver that his friend, MENDEZ, stated that he is a LAPR, but, because MENDEZ was not in possession of his LAPR/I-551 card, the agents were confirming his immigration status.  BPA Rosa reminded the driver and MENDEZ that Section 264(e) of the Immigration and Nationality Act requires all lawful permanent residents to have "at all times" official evidence of their LAPR status and failing to do so is a crime.  After hearing this, the driver's

behavior began to shift as he lowered his head.  For example,
the driver began nodding his head and taking deep breaths which
gave BPA Rosa the impression that he was starting to become
nervous and anxious.  At this time, BPA Rosa asked the driver if
he knew his passenger's name.  The driver admitted to not
knowing MENDEZ's name.

17.   BPA Rosa then questioned MENDEZ as to his route of
travel.  MENDEZ said that he was visiting the driver's father in
Arizona.  MENDEZ stated that he and the driver were on their way
to Bakersfield, California.

18.   BPA Masney conducted law enforcement checks regarding
MENDEZ's citizenship status.  BPA Masney confirmed with BPA Rosa
that MENDEZ did not have proper immigration documents to be
present in the United States legally.  In addition, MENDEZ was
previously removed from the United States to Mexico by an
Immigration Judge on April 12, 2007 with three later
reinstatements of that removal order in 2011, 2014, and 2019.

19.   BPA Masney directed MENDEZ to exit the Target Vehicle.
BPA Masney placed MENDEZ under arrest and transported him to IDO
for further interview and processing.  BPA Masney also seized
the SUBJECT DEVICE.

**B.    Border Patrol Agents interview MENDEZ.**

20.   On Monday, August 26, 2019, at approximately 1:28
p.m., MENDEZ was read his Miranda Rights by BPA Masney and
witnessed by BPA Bevis.  MENDEZ indicated that he understood his
rights and he was not willing to speak to the agents outside the
presence of a lawyer.  The interview with MENDEZ concluded at

7

1:30 p.m.  MENDEZ was also advised of his right to communicate with the consular or diplomatic officers from his country of Mexico.  MENDEZ declined.

**C.   Immigration and Criminal History.**

21.   Based on my training and experience, I know that the United States Department of Homeland Security ("DHS") maintains Alien Registration Files ("A-Files") which contain immigration records for aliens admitted to or found within the United States.  Based on my review of such A-Files, I know that they contain photographs, fingerprints, court records, and records of deportations or removals relating to the alien for whom DHS maintains the A-File.

22.   On August 26, 2019, BPA Masney took MENDEZ's fingerprints and queried them through the Integrated Automated Fingerprints Identification System for confirmation of criminal and immigration history.  Records associated to MENDEZ's fingerprints indicated that he was issued Alien File (A-File) No. XXX XXX 849.  On August 26, 2019, I requested digitized copies of A-File No. XXX XXX 849.

23.  I have reviewed digital copies of the documents within A-File No. XXX XXX 849, the A-File DHS maintains on MENDEZ, as well as information from other DHS databases.  Based upon my review of the A-File, I learned that A-File No. XXX XXX 849 contains documents and information, including the following:

a.   Photographs of MENDEZ, which I confirmed depicted the person that was in our custody.

b.    A Deportation Order from an Immigration Judge, showing that MENDEZ was ordered removed from the United States to Mexico by an Immigration Judge in Eloy, Arizona, on April 12, 2007.

c.    Executed I-205 Warrant of Removal/Deportation indicating that MENDEZ was officially removed/deported from the United States on or about April 12, 2007.  Based on my training and experience, I know that an I-205 Warrant of Removal/Deportation documents the execution of an order directing the removal of an alien from the United States, and an I-205 Warrant of Removal/Deportation is executed when an alien is removed or deported from the United States.  An I-205 Warrant of Removal/Deportation will generally have a photograph and the right index fingerprint of the alien removed or deported.  A fingerprint and photograph of MENDEZ is affixed to the I-205 Warrants of Removal/Deportation contained in A-File No. XXX XXX 849.

d.    Reinstatements of the 2007 removal orders and associated Warrants of Removal/Deportation showing that MENDEZ was removed from the United States to Mexico in on or about April 12, 2007, March 4, 2011, November 17, 2014, and January 18, 2019.

e.    Copies of court records showing that MENDEZ was convicted of numerous crimes previously, including

i.    Grand Theft of Property, in violation of California Penal Code Section 487(a), on or about December 3, 2014, in the Superior Court of the State of California, County

9

of Kern, for which MENDEZ was sentenced to 3 years of imprisonment;

ii.  First Degree Burglary, in violation of California Penal Code Section 460(a), for which he was sentenced to 2 years of imprisonment, Taking a Vehicle Without Owner's Consent, in violation of California Vehicle Code Section 10851(a), for which he was sentenced to 8 months of imprisonment, and Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), for which he was sentenced to 8 months of imprisonment, in the Superior Court of the State of California, County of Kern, on or about March 25, 2016; and

iii. Deported Alien Found in the United States, in violation of 8 United States Code, Section 1326(a), for which he was sentenced to 21 months of imprisonment, in the United States District Court for the Eastern District of California, on or about June 21, 2017.

24.  I have reviewed several documents in MENDEZ's A-File that indicated he is a native and citizen of Mexico.  These documents include the following:

a.  A Deportation Order from an Immigration Judge, dated April 12, 2007, ordering MENDEZ removed from the United States to Mexico.

b.  A Record of Inadmissible/Deportable Alien (Form I-213), dated October 26, 2006, in which MENDEZ admitted that he was a native and citizen of Mexico.

10

c.   A Warning to Alien Ordered Removed or Deported (Form I-294), dated April 12, 2007, in which MENDEZ affixed a fingerprint indicating acknowledgement of inadmissibility/exclusion from the United States.

25.  On August 26, 2019, I reviewed the printouts of the National Crime Information Center ("NCIC").  Based on my training and experience, I know that the NCIC database tracks and records arrests and convictions of individuals according to an individual's Federal Bureau of Investigations ("FBI") number. The NCIC printouts confirmed that MENDEZ had been convicted of the crimes reflected in the documents contained in MENDEZ' A-File.

26.  In reviewing A-File No. XXX XXX 849, I was unable to locate any record of MENDEZ ever applying for, or receiving, the permission of the United States Attorney General or the Secretary of the Department of Homeland Security to re-enter the United States following deportation or removal.  Based on my training and experience, I know that such permission is required to re-enter the United States legally after deportation, and that if such permission had been granted, it would have been documented in MENDEZ's A-File.

## IV. TRAINING AND EXPERIENCE ON ALIEN SMUGGLING

27.  Based on my experience and training, I am familiar with the methods employed in smuggling operations and the smuggling patterns employed by such organizations.  I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their

11

investigations and interviews.  I have become familiar with the methods of operation typically used by alien smugglers.  Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware that alien smugglers often use one or more telephones, pagers, or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and customers, regarding matters such as price, arrival time, and meet location.  This communication can occur by phone, text, email, or social media.  Further, alien smugglers will also use text messages to send photographs as codes or actual pictures or videos.  I know that the above-described information can be stored on digital devices carried both by the alien smugglers and their customers.

///

///

## V.  CONCLUSION

28.  For all of the reasons described above, there is probable cause to believe that MENDEZ has committed a violation of Title 8, United States Code, Sections 1326(a) and (b)(2) (Deported Alien Found in the United States).

29.  Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE as described above and in Attachment A.

KIMBERLY R. CHRISTOFF
Border Patrol Agent
U.S. Border Patrol

Subscribed to and sworn before me
this 28 day of August 2019.

UNITED STATES MAGISTRATE JUDGE